COURT OF APPEALS,

Oct. 28, 1913.

# THE PEOPLE v. CHARLES KATZ.

(209 N. Y. 311.)

(1.) LARCENY—CONSPIRACY IN COMMITTING—PENAL LAW, §§ 2, 1290—
WHEN ASSOCIATE OR ACCOMPLICE IS GUILTY AS PRINCIPAL.

Under the statute (Penal Law, § 2; Cons. Laws, ch. 40; Penal Law, § 1290) he is a principal who has feloniously taken any part in the commission of the crime of larceny, and it is proper to indict him separately or jointly with others. Either form of indictment will sustain a conviction based upon evidence establishing guilty participation in the crime, even though defendant may not have been present at its final consummation.

(2.) SAME—EVIDENCE OF COMMISSION OF SIMILAR CRIMES WHEN COMPETENT.

Ordinarily a man cannot be convicted of one crime by proof that he was guilty of another when there is no connection between the two. There are various recognized exceptions to this rule, however, and one of them is that when guilty knowledge, commonly called intent, is an essential ingredient of the crime charged, evidence is admissible of similar crimes or acts committed or attempted at or about the same time by the person charged. In such case guilty knowledge of a defendant may be proved by evidence of his complicity in similar offenses under such circumstances as to support the inference that the act charged was not innocently or inadvertently committed.

(3.) SAME—GUILTY KNOWLEDGE.

Upon the question of defendant's guilty knowledge it is competent to show that defendant's attention was called to the fact that in the opinion of the witness and that of a third person referred to by him, the proposed transaction was criminal.

(4.) SAME—ASSOCIATION WITH MEN ENGAGED IN THE LARCENY.

It was also proper to show that defendant was associated with men about whose antecedents he had made no inquiry, and who were engaged in transactions which resulted in criminal prosecutions, when the evidence was elicited solely for the purpose of proving the defendant's previous connection with other similar transactions through the agency of men whose reputations, no less than the character of the transactions, were important factors in determining whether the defendant was a victim or a conspirator.

(5.) SAME—CHARGE OF JUDGE AS TO CORROBORATION OF ACCOMPLICE.

The trial justice, in referring to the rule which requires corroboration of the testimony of an accomplice, charged that when such testimony is corroborated by witnesses who appear to be honest and truthful, it "becomes testimony of such an order as entitles you to give it great consideration, notwithstanding the fact that it is the testimony of an accomplice." *Held*, that when this part of the charge is considered in connection with the context, it is a fair and conservative statement of the law.

(6.) SAME—PRACTICE.

At the close of the charge the court said, in reference to a request by the defendant: "The counsel have submitted to the court one hundred and two requests to charge and the court grants an exception to each and every request refused by the court on the ground that they are already covered in the charge." Defendant's counsel then added: "And the defendant takes an exception to the refusal of the court to charge each and every request propounded by the court," to which the court answered: "Yes." *Held*, that this practice should not be followed by trial courts or sanctioned by appellate tribunals.

(7.) SAME—AN ACCOMPLICE MAY BE CORROBORATED BY SHOWING THAT HE PREVIOUSLY WHEN THE TEMPTATION TO FALSIFY MAY BE DEEMED TO HAVE ARISEN MADE A STATEMENT WHICH IS CONSISTENT WITH HIS SWORN TESTIMONY.

Since an accomplice, and especially an accomplice who has been promised immunity, is always under a suspicion of discredit, implied from his interest to screen himself and to secure the conviction of his associates, it is competent to corroborate him by showing that at some time anterior to the period when the temptation to falsify may be deemed to have arisen he made a statement

which is consistent with his sworn testimony. Such a case is within an acknowledged exception to the general rule that the testimony of a contradicted, impeached or discredited witness cannot be confirmed by proving that he has made similar declarations out of court. Authorities on this point collated and considered. (People v. Vane, 12 Wend. 78, followed; Robb v. Hackley, 23 Wend. 50, distinguished.)

(8.) SAME—WHERE IMMUNITY WAS GRANTED TO ACCOMPLICE.

A witness for the People was an accomplice in the perpetration of the crime charged against the defendnat, and the district attorney admitted that he had promised him immunity if he would become a witness against the defendant. His cross-examination by defendant's counsel was an effort to break the force of his testimony by showing that he was surrounded by every temptation to falsify in order to earn his recently promised immunity. After the cross-examination the district attorney offered in evidence a type-written statement which the witness had dictated to a stenographer in the office of his attorney shortly after his arrest and about a year before he had any communication with the district attorney on the subject of immunity. This statement was in all essential particulars the same as his testimony on the trial. The proposed evidence was objected to by defendant's counsel, but the court received it and gave the defendant an exception. *Held*, no error.

People v. Katz, 154 App. Div. 44, affirmed.

APPEAL from an order of the Appellate Division of the Supreme Court in the first judicial department, entered December 20, 1912, which affirmed a judgment rendered at a Trial Term, upon a verdict convicting the defendant of the crime of grand larceny in the first degree.

The facts, so far as material, are stated in the opinion.

*Benjamin N. Cardozo* and *John F. McIntyre* for appellant. The court erred in receiving evidence by which it was intended to prove that another and similar crime had been attempted by the defendant. (People v. Governale, 193 N. Y. 581; People v. Sharp, 107 N. Y. 427; People v. Romano, 84 App.

Div. 318; People v. Molineux, 168 N. Y. 264; People v. Marrin, 205 N. Y. 275; Marshall v. United States, 197 Fed. Rep. 511; Goresen v. Comm., 99 Penn. St. 388; People v. Zucker, 20 App. Div. 363; 154 N. Y. 774; People v. Dudenhausen, 130 App. Div. 760; People v. Sekeson, 111 App. Div. 490.) The court erred in allowing the witness Clark to corroborate his own testimony by proof of previous statements made to his own attorney. (Robb v. Hackley, 23 Wend. 50; Matter of Hesdra, 119 N. Y. 50; People v. Smith, 162 N. Y. 520; People v. Collier, 141 App. Div. 111; Jenkins v. City of Hudson, 40 Hun, 426, 428; Dudley v. Bollis, 24 Wend. 465; Smith v. Stickney, 17 Barb. 489; Comin v. Jenkins, 10 Gray, 485; Austin v. Bartlett, 178 N. Y. 310; People v. Wolf, 183 N. Y. 477; Connolly v. B. H. R. R. Co., 179 N. Y. 7.) The court erred in allowing the witness Birmingham to corroborate his own testimony by proof that he had previously testified to the same effect before the grand jury (Austin v. Bartlett, 178 N. Y. 310; Connolly v. B. H. R. R. Co., 179 N. Y. 7; People v. Wolf, 183 N. Y. 477.) The court erred in allowing the district attorney to show that some of the men between whom and the defendant there had been certain business dealings had been either indicted or convicted of other crimes. (People v. Irving, 95 N. Y. 541; People v. Morrison, 195 N. Y. 116; People v. McGraw, 66 App. Div. 372.) The court erred in allowing the witness Schwed to testify that he had communicated to the defendant the opinion of a member of the Stock Exchange that the proposed transaction was criminal. (People v. Conrow, 200 N. Y. 356; People v. Cascone, 185 N. Y. 317; People v. Smith, 172 N. Y. 210.) The defendant duly excepted to the refusal of the court to charge as he requested, and such exception was sufficient. (McKinley v. Met. St. Ry. Co., 77 App. Div. 256; Connor v. M. S. Ry. Co., 77 App. Div. 384; Stephens v. Ely, 162 N. Y. 79.) The court erred in refusing

the defendant's forty-fifth, forty-sixth, forty-seventh and fifty-seventh requests. Each of these requests embodied a correct proposition of law, important for the defendant's protection. It was a possible inference from the proof that the defendant, knowing that Clark and Sherwood were engaged in some irregular practice, was indifferent to their wrongdoing, or even secretly approved of it, but was unwilling to take part in it himself, or to share in its fruits. This may be an offense in morals; it is not a crime. O'Donnell v. Clinton, 145 Mass. 461; Stover v. People, 56 N. Y. 315.) The court erred in its charge that the testimony of accomplices, if corroborated, is entitled to great consideration. (People v. Ferraro, 161 N. Y. 379.) The court erred in refusing to charge, as a matter of law, that Birmingham was an accomplice. (Penal Law, § 1290.) The indictment charges the defendant as principal, and is not sustained by proof that he aided and abetted others, who were not indicted with him. (People v. Kane, 161 N. Y. 386; People v. Albow, 140 N. Y. 130; People v. Corbalis, 178 N. Y. 516; 1 Bishop Crim. Law, § 632; People v. Bliven, 112 N. Y. 79; People v. Patrick, 182 N. Y. 131; 183 N. Y. 52; People v. McKane, 143 N. Y. 455; People v. Coombs, 36 App. Div. 284; 158 N. Y. 532; People v. Seldner, 62 App. Div. 357; Mulligan v. Commonwealth, 84 Ky. 229.)

*Charles S. Whitman, District Attorney* (*Robert C. Taylor* of counsel), for respondent. The indictment is adequate. (People v. Phelps, 72 N. Y. 334; People v. Dorthy, 20 App. Div. 308; People v. Bliven, 112 N. Y. 79; People v. Peckens, 153 N. Y. 576; People v. Patrick, 183 N. Y. 52; People v. West, 106 N. Y. 293; People v. Weldon, 111 N. Y. 569; People v. Herlihy, 66 App. Div. 534; People v. Laurence, 137 N. Y. 517; People v. Knapp, 206 N. Y. 373.) There was no error in admitting Schwed's testimony. (People v. Scott, 153

N. Y. 40; People v. McGuire, 135 N. Y. 639; People v. Youngs, 151 N. Y. 210; People v. Tice, 131 N. Y. 651; People v. O'Sullivan, 104 N. Y. 481; People v. Wagner, 180 N. Y. 58; People v. Weinseimer, 117 App. Div. 603; 190 N. Y. 537; People v. Molineux, 168 N. Y. 264; People v. Weisenberger, 73 App. Div. 428, 432; People v. Dolan, 186 N. Y. 4, 10; People v. Neff, 191 N. Y. 210, 226.)    Throughout the cross-examination an attempt was made to convince the jury that Clark was prompted by a motive to make a false statement, and that he had turned state's evidence and fabricated a story to save himself at Katz's expense.    Such being the condition at the close of the cross-examination, it became proper to receive Clark's prior consistent statement.    Where a witness is charged with giving his testimony under the influence of some motive prompting him to make a false or colored statement, it may be shown that he made similar declarations at a time when the imputed motive did not exist.    (Matter of Hesdra, 119 N. Y. 615; Robb v. Hackley, 23 Wend. 50; Wigmore on Ev. §§ 1128, 1129; Comm. v. Jenkins, 10 Gray, 485; People v. Buchanan, 145 N. Y. 1.)    The court properly refused to charge that Birmingham was an accomplice.    (People v. Zucker, 20 App. Div. 363; 154 N. Y. 770; People v. Russo, 126 App. Div. 717.)    The questions about Persch, Aldhouse and Adams were all proper.    Katz's position is quite similar to that of a good character witness.    He was trying to convince the jury that he was justified in believing that his associates were of good character.    Hence, it was proper to test his belief by a cross-examination such as is legitimate in the case of a good character witness.    (Wigmore on Ev. 1316, § 1111; Annis v. People, 13 Mich. 517; Abb. Tr. Br. [2d ed.] 166, 430; Carpenter v. Blake, 10 Hun, 358; People v. Jeffrey, 82 Hun, 409; People v. Elliott, 163 N. Y. 11; People v. Laudiero, 192 N. Y. 304; People v. Levine, 140 App. Div.

910; People v. Callahan, 73 Misc. Rep. 455.) The alleged exceptions to the refusals to charge are not such exceptions as confer jurisdiction upon this court. (People v. Stone, 117 N. Y. 480; People v. Zachello, 168 N. Y. 35; People v. Buddensieck, 103 N. Y. 487; People v. Hughes, 137 N. Y. 29; People v. Wiechers, 179 N. Y. 459; People v. Jackson, 196 N. Y. 357; People v. Johnson, 185 N. Y. 219; People v. Lumsden, 141 App. Div. 158; 201 N. Y. 264.)

WERNER, J.:

The defendant appeals from a judgment of the Appellate Division in the first department affirming a judgment entered upon a verdict at Trial Term, convicting him of the crime of grand larceny in the first degree. The case is one of unusual interest, both in respect of the novel scheme or method by means of which the crime is said to have been perpetrated, and the number, variety and importance of the questions which we are asked to decide. More than three hundred exceptions were taken by defendant's counsel to the rulings of the trial court, but many of these may be assigned to groups relating to different classes of testimony to which separate objections were repeated as the respective witnesses were examined. These groups of exceptions will, of course, be considered collectively, but even this resort to economy of space and time can only measurably foreshorten this discussion, because a careful and comprehensive statement of the facts is no less essential than a thorough discussion of the questions of law involved.

It appears that one Heinze, a large operator in mines and mining stocks, had been a borrower of money upon the pledge of such stocks. This fact became known to one Clark, a curb broker, who sought an interview with Heinze in July, 1909, and learned that the latter was desirous of obtaining a loan

of $50,000 upon a pledge of $100,000 of mining stocks as col-
lateral.    When Heinze asked who was to make the loan, Clark
replied that it would be made by the Windsor Trust Company.
This being apparently satisfactory to Heinze, Clark inter-
jected the suggestion that the Windsor Trust Company would
not deal with Heinze.    Thereupon Heinze sent for Joyce, a
broker, and made a formal transfer of the stocks to him for the
purpose of enabling him to negotiate the loan.    Joyce and
Clarke at once went to the Windsor Trust Company, where
they met one Birmingham, the manager of the bond department.
After Joyce and Birmingham had been introduced to each
other, and it had been settled that the loan would be made,
Joyce executed a note, payable to his own order, upon a form
furnished by the trust company, and deposited 15,600 shares
of Ohio Copper stock and 4,600 shares of Davis-Daly stock as
collateral.    Within a few minutes after Birmingham, and the
employee of the trust company, had taken the note and the
stocks into an adjoining room, he returned with $48,500 in
currency which he gave to Joyce, who supposed that the deduc-
tion of $1,500 was to cover the first six months of interest on
the note.    After Joyce had received his money, and had made
a temporary deposit of it in the trust company, he returned
to his office where he was soon joined by Clark who requested
the payment of his brokerage commissions which had been
agreed upon at four per cent amounting to $2,000. · Clark re-
ceived his commissions and Joyce regarded the matter as
closed.    Within a few days he was surprised to learn that
some of the very stocks which he had deposited with the trust
company had been sold in the market.    At once he went to
Birmingham, of the trust company, to inquire into the matter,
and ascertained that the loan, which he supposed had been
made by the trust company, had in fact been made by some
one else, and that the securities which he had deposited as col-

lateral, instead of being safely held by the trust company, had been delivered to one Sherwood. Thereupon Joyce brought the matter to the attention of the district attorney. This is a brief outline of the borrower's connection with this remarkable transaction. We now pass to a statement of the part played by the thieves and those whom they employed.

In the early part of 1909 Clark, the curb broker, had an office in Exchange Place. He had been introduced to the defendant and one Persch by a man named Schwed. This acquaintance between Clark, Persch and the defendant ripened into an intimacy which resulted in a business arrangement under which the defendant and Persch were to rent one of the office rooms of Clark, and the three were to share equally in the profits of their joint transactions. This was the situation when, according to the testimony of Clark, there was a discussion between him and the defendant and Persch of a plan for negotiating a loan on the Heinze stocks. Clark called attention to the necessity of procuring an apparently trustworthy party to make the loan, as Heinze had been made quite cautious by a previous experience in which he had lost his stocks. Clark also suggested that he had a relative in a New Jersey bank, representing Keene and Van Cortlandt who were well-known stockbrokers, and that he might get this bank to clear the loan. The attempt was made but failed because Keene and Van Cortlandt refused to sign a trust certificate. At this juncture the defendant is said to have suggested that he knew a broker named Kaufman who might be able to procure a bank to clear the loan. Kaufmann appeared at the offices occupied by Clark, Persch and the defendant. The latter, who was just going out, said to Kaufmann, " the boys," referring to Clark and Persch, " have a proposition for you." Kaufmann talked with Clark and Persch and was told that the Eastern Brewing Company, of which the defendant was presi-

dent, wanted to make a loan of $50,000 on certain mining stocks, but was not to be known in the transaction, and that Ullman, one of the brewing company's employees, would be the ostensible lender. Kaufmann went out to see about procuring a bank and called at the offices of the Windsor Trust Company, where he repeated to Birmingham the substance of the representations made to him by Clark and Persch, and proposed that the trust company clear the transaction for a fee or commission of $1,000. Birmingham said he would consult the officers of the company and would see Kaufmann later. Meanwhile Kaufmann returned to the offices of Clark, Persch and the defendant and reported that he had applied to the Windsor Trust Company, and at the suggestion of Birmingham had put his application in the form of a letter, of which he produced a rough draft, in which the Eastern Brewing Company was named as the lender. The defendant, who had returned to the office, objected vigorously to the use of the name of the brewing company and insisted that Ullman's name be used. Kaufmann returned to the trust company where Birmingham informed him that the trust company would clear the transaction, and Kaufmann then wrote a formal letter, addressed to Birmingham as manager of the bond department of the trust company; in which he stated that as broker for the lender he had arranged a loan to responsible parties upon a promissory note secured by certain mining stocks; that the borrower was represented by a broker who was on friendly terms with the lender, and as neither party wished to appear in the transaction, it had been arranged to have the trust company clear the loan; that the lender would deposit with the trust company the principal of the loan and the commissions, and that nothing would be required of the trust company except to transfer the note and securities to the lender in exchange for the cash which was to be deposited. The letter

further stated that the trust company was to be held harmless by a separate agreement which was to be executed, and that the commissions for its services should be $1,500, out of which it was to pay Kaufmann $500; and it concluded with the statement that the lender was Mr. Henry Ullman, general manager of the Eastern Brewing Company, and that the borrower, so the writer was assured, was not a member of the Heinze family. This letter was shown by Kaufmann to the defendant, and these two then discussed the matter of Kaufmann's commission. It was finally agreed that Kaufmann was to receive $500 in addition to what he might be able to get from the trust company. Kaufmann and Clark then went to the trust company, where the latter inquired if Birmingham would give him a written confirmation that the trust company would clear the loan, and Birmingham replied that it was not necessary; but in answer to Clark's further inquiry he stated that he would confirm it over the telephone. It was at this point of time in the transaction that Clark reported to Heinze that the trust company had agreed to make the loan.

There is still another chapter of this story which it is necessary to recite in order to understand the nature and scope of the scheme by means of which possession of the Heinze securities was obtained. One Sherwood was an employee of L. J. Field & Co., a firm of brokers in Broadway. Sherwood had known Clark, Persch and the defendant for several months. In the latter part of July, 1909, he talked with Clark and Persch about getting a loan of $50,000 on some Heinze mining stocks. Sherwood said he could furnish the money and was told by Clark that Keene and Van Cortlandt would clear the loan. He took the money to Keene and Van Cortlandt's, but the stock was not there, and the reason assigned was that the party who brought it had asked for a trust certificate which Keene and Van Cortlandt had refused to give.

Clark and Persch, to whom Sherwood reported, thereupon asked if the money could not be held pending an effort to get another bank to clear the loan. Sherwood conferred with Mr. Field, who was furnishing the money, and then notified Clark and Persch that the money would be held. It was at this juncture that Kaufmann was called into the transaction, and after he had successfully negotiated for the clearance of the loan by the Windsor Trust Company he and Clark and Sherwood appeared at the banking house of the trust company and there they met Birmingham. Sherwood was introduced as the broker for the lender, and Clark was posing as the broker for the borrower. Owing to some misunderstanding as to the kind of stocks which were to be deposited as collateral, the matter was postponed from Saturday until the following Monday, when there was another meeting of the trust company. Joyce was there with his stocks, and he was placed in one room. Sherwood was there with the money and he was placed in another room. So far as appears, neither knew that the other was there, and it is certain they did not meet. After the details of the transaction had been satisfactorily adjusted, Joyce took his money, less the $1,500 retained by the trust company; and the note and stocks were delivered to Sherwood who took them away with him. Joyce, as has been observed, did not know that the trust company was retaining $1,500 for commissions, of which $500 was to go to Kaufmann, and he supposed that the $1,500 was deducted to pay the first six months' interest on his note; neither did he know that there was any other lender in the transaction than the trust company. Within a few days, Joyce heard of sales of his stocks on the market, and he at once reported the matter to Birmingham, who took fright and called the defendant on the telephone, stating to him that the borrower had made a tender and demand for his stock. This was on Saturday. The defend-

the check for $488.75, which the defendant admits receiving from Persch, the defendant's explanation is that he supposed this was his one-third of the legitimate commissions for negotiating the loan. As bearing upon that circumstance there was other testimony, given by the defendant, which may have been influential in determining the weight which the jury gave to this explanation. The defendant testified that Clark brought to him $1,000 which was stated to be a part of the commission for putting through the loan; that he deposited the amount and against it he drew a check for $500 to Kaufmann for his commissions, and another check of $300 to Ullman for having permitted the use of his name, and the balance of $200 was split up into three parts between him and Clark and Persch. There are many other facts and circumstances upon which counsel for the prosecution rely to connect the defendant with felonious participation in the larceny charged in the indictment. We cannot further enlarge upon them without extending the discussion beyond reasonable limits. It remains simply to add that the defendant was a witness in his own behalf and testified at length. While he admitted his association with the other persons engaged in this nefarious transaction, he either denied or attempted to explain everything which tended to charge him with guilty knowledge of its true nature. His attitude was that he had innocently become the tool of designing criminals, and to support his asseverations in this behalf he gave evidence of his previous good character and high business connections. The record as a whole clearly presents an issue of fact for the determination of a jury, and we should not disturb the verdict rendered against the defendant unless it appears, as he asserts, that his rights have been jeopardized by erroneous rulings made at the trial.

The learned counsel for the defendant argues that the in-

ant replied that the stock was all right and would be produced
on Monday.    Birmingham was still uneasy, however, and he
sent for the defendant, who went straightway to the trust
company.    There Birmingham said, in substance, that he did
not even know if the defendant was in fact the Charles Katz
who was president of the Eastern Brewing Company; and
the defendant took Birmingham to the bank with which
the brewing company did its banking business, and where the
defendant was satisfactorily identified.

Before passing to the sale of the stocks, which figure in
this transaction, and the disposition of the proceeds thereof,
there is one other phase of the scheme which must be noticed.
Sherwood came into the possession of both the note and the
stocks.    According to Joyce's understanding of the tran-
saction Sherwood had no right to either, for the Windsor Trust
Company was supposed to be the lender.    If a felonious appro-
priation of the stocks was contemplated it was obviously im-
portant that the thieves should cover their tracks with some-
thing bearing at least the semblance of a lawful transaction.
This was sought to be accomplished by having Ullman, the inno-
cent dupe who had already been used as the ostensible lender,
make a note in which he appeared as the borrower from
Persch.    This note, which Ullman signed upon the defend-
ant's assurance that it would be all right, contained a
clause giving the holder the right to sell the pledged se-
curities at any time or in any manner.    Persch then gave
Sherwood a written authorization to receive the stocks, and
another writing directing Sherwood to sell the stocks for
Persch's account.    This Ullman note was not produced at the
trial and it does not appear what became of it.

We now come to the closing features of this bold and in-
genious scheme.    Without going into all the details of the dis-
position of the stocks, it is enough to say that they were sold

for $94,000. Out of this sum Sherwood returned to L. J. Field & Co. the $50,000 which they had advanced. He further gave them a check payable to the order of Persch and indorsed by him for $10,175, and drew another check to the order of Persch for $4,000, which was indorsed over to Sherwood; these two sums representing, as he stated, the 35 per cent commission which Field & Co. were to have in the transaction. For the balance of $30,455.78 he gave his check to Persch, which the latter deposited with the Carnegie Trust Company, where he was introduced by the defendant. Sherwood had also turned over to Persch 400 shares Ohio Copper which the latter sold through a broker named Reilly, upon which there was realized $1,466.25, and this was paid to Persch by Reilly's check. Of this latter sum there was paid to Clark $488.75 and to the defendant a like amount by the checks of Persch. In addition to this, Clark received Persch's check for $10,009.92, and Persch's wife received several checks for similar amounts. What became of the other $10,000? Clark testified that it was paid to the defendant, and the defendant denies it. Clark's story is to the effect that at the Marquette Club Persch tendered to the defendant a check for $10,000 which the latter declined on the ground that he wanted his in cash; that Persch then said he would give him cash in the morning. And in this connection it should be noted that Clark, Persch and the defendant were at the bank the next morning. The defendant's version of this part of the affair is quite different. He admits the meeting at the Marquette Club, and admits taking the check, but he says he took it protesting that he could not understand how so large a profit could legitimately have been made in the transaction, and he says he kept it until the next morning, when he returned it because Persch was not able to give a satisfactory explanation of how he had acquired this amount of money. In respect of

dictment, which charges the defendant as principal, is not sustained by proof that he aided and abetted others who were not jointly indicted with him. The indictment contains three counts, but the only one we need consider is the first, which charges larceny in the simple common-law form. This count charges the defendant with feloniously stealing, taking and carrying away the property described, and the argument is that such a charge is not sufficient to permit proof that the defendant aided and abetted others in the consummation of a conspiracy to commit larceny. Over against this argument we quote the plain language of the statute that " a person concerned in the commission of a crime, whether he directly commits the act constituting the offense or aids and abets in its commission, and whether present or absent, and a person who directly or indirectly counsels, commands, induces or pro- cures another to commit a crime, is a ' principal.' " (Penal Law, section 2; Cons. Laws, ch. 40.) Larceny, as defined in section 1290 of the Penal Law, embraces every act which was larceny at common law, besides other offenses which were formerly indictable as false pretenses or embezzlement. And the common-law offense has been held to be established by proof showing that the defendant obtained possession of the prop- erty by some trick, fraudulent device or artifice with felonious intent. (People v. Miller, 169 N. Y. 339; 16 N. Y. Crim. 281.) The crime charged against the defendant is larceny; and that is the offense of which he was convicted. Under the statute (Penal Law, section 2) he is a principal if he has feloniously taken any part in the commission of the crime, and it was, therefore, proper to indict him separately, or jointly with others. Either form of indictment will sustain a conviction based upon evidence establishing his guilty par- ticipation in the crime, even though he may not have been

present at its final consummation. (People v. Bliven, 112 N.
Y. 79; People v. Patrick, 183 N. Y. 52.)

It is contended that the trial court erred in receiving
evidence tending to prove that the defendant had previously
been concerned in an attempt to commit another and similar
crime, and this contention is based upon the testimony of one
Schwed which was received under objection and exception.
Schwed, it will be remembered, is the man who introduced
Clark to the defendant and Persch in the early part of 1909,
on the same day that the defendant introduced Persch to
Schwed. According to the testimony of Schwed, he had a
talk with the defendant at that time in which the latter re-
ferred to Persch as the credit man of some bank, who was de-
sirous of making a loan on curb stocks, and that he under-
stood Heinze was always in the market as a borrower in fur-
therance of his manipulations; that according to reports there
was an opportunity to get $27,000 of the Heinze stocks, con-
sisting of United Copper, Ohio Copper and Davis-Daly on
which the Heinze people wanted to borrow $15,000 which
Persch and the defendant were willing to furnish upon these
stocks as collateral. Schwed testified that the defendant
asked him if he could get a stock exchange house to clear the
loan, to which Schwed replied that it ought to be very simple;
that thereupon the defendant or Persch said that whoever
cleared the loan would have to sign a receipt for the certificates
and yet leave them accessible to Persch and the defendant;
that Schwed said this was impossible with a stock exchange
house. Schwed further stated that the defendant confided
to him that the plan was to get possession of the collateral and
sell it on the market; that a loan of $15,000 on $27,000 of se-
curities would leave a margin of about $12,000 which would
be clear profit; that when he, Schwed, asked how these stocks
would be restored and made good when the loan was called,

the defendant explained that the sale of these stocks, and other similar sales, would so depress the stocks that they could be bought back for much less than they were sold, and the differ-ence would represent the profit which would be made in the tran-saction. Schwed further testified that when he suggested, " suppose the stocks go up? " the defendant said, " If it goes up of course there are other cities in which you can do business as well as in New York; " and that the interview was closed by Schwed's statement that the defendant " had better get a crook to do that." The defendant said he could get other brokers but their standing would not be acceptable to Heinze, and asked Schwed if there was not some way in which they could get in touch with the person who would put through such a deal. It was at this time, so says Schwed, that he took the defendant and Persch over to the office of Clark to intro-duce them. Defendant's counsel challenge the competency of this evidence under the well-known rule that guilt of one crime may not be established by proving the commission of another and wholly independent crime. The general rule upon which counsel rely is too familiar and too long settled to require dis-cussion. It is the law that ordinarily a man cannot be con-victed of one crime by proof that he was guilty of another. (Coleman v. People, 55 N. Y. 81; People v. Sharp, 107 N. Y. 427; 5 N. Y. Crim. 569; People v. Molineux, 168 N. Y. 264; 16 N. Y. Crim. 120; People v. Governale, 193 N. Y. 581; 23 N. Y. Crim. 114.) There are various recognized excep-tions to this rule, however, and one of them is that when guilty knowledge, quite commonly called intent, is an essential in-gredient of the crime charged, evidence is admissible of similar crimes or acts committed or attempted at or about the same time by the person charged. The reasons for the rule and the exception are equally simple and obvious. The general rule is rooted in the principle that a man may not be convicted of one

crime simply because he may be shown guilty of another when there is no connection between the two. Simple proof showing that A. shot B. at one time and place throws no light upon the charge that A. poisoned C. at another time and place. In either of these cases guilty knowledge or intent is inferable from the nature and surroundings of each act, and each must be judged on its own circumstances. Quite another principle is to be invoked, however, when guilt cannot be predicated upon the mere commission of the act charged as a crime. In such a case the general rule gives way to the exception under which guilty knowledge of a defendant may be proved by evidence of his complicity in similar offenses under such circumstances as to support the inference that the act charged was not innocently or inadvertently committed. Familiar illustrations of this exception to the general rule are to be found in cases of uttering counterfeit money, in forgery, in obtaining money under false pretenses, and in receiving stolen property. (Commonwealth v. Jackson, 132 Mass. 16; Commonwealth v. Bigelow, 8 Met. 235; Commonwealth v. Stone, 4 Met. Helm's Case, 1 City Hall Rec. 46; Smith's Case, 1 id. 49; Commonwealth v. Johnson, 133 Pa. St. 293; Coleman v. People, 58 N. Y. 555; Copperman v. People, 56 N. Y. 591; People v. McClure, 148 N. Y. 95; Commonwealth v. Russell, 156 Mass. 196; People v. Everhardt, 104 N. Y. 591; People v. Dolan, 186 N. Y. 4; People v. Neff, 191 N. Y. 210; People v. Marrin, 205 N. Y. 275.) The application to the case at bar of the principle upon which these cases were decided can be simply illustrated in the light of a few undisputed facts. If the evidence had tended to show that the defendant had been guilty of a simple common-law larceny, by a physical trespass and a felonious asportation of the property, it would be true that evidence of other similar larcenies would have been inadmissible. The reason is obvious. In such a case the guilty knowledge or intent is proved

by the act itself, and it would add nothing to the proof of guilt to show that on other occasions the defendant had committed other similar larcenies. That is not the case at bar. Hence the larceny was committed by means of a conspiracy which required a number of actors to carry out the involved and ingenious plot, and it is quite possible that an innocent man, who had inadvertently and unfortunately made a business connection with one or more of the conspirators, might have been drawn into the meshes of the scheme without any criminal knowledge or purpose on his part. That is precisely the position which the defendant claims to have occupied in this transaction. Although confessedly a participant in certain phases of the scheme, he asked the jury to believe that his connection with it was free from criminality, and his story was such that if the jury had found for him the verdict could not have been questioned for lack of evidence to support it. His narration of the affair, while strongly indicative of guilt, was not incompatible with innocence, and, therefore, the real issue was whether he was a guiltless scapegoat or a guilty conspirator. That is exactly the typical case in which evidence of other similar offenses may be proven. The talk with Schwed about the $15,000 loan was practically identical, in point of time, with the transaction in the case at bar, and it related to a loan upon the Heinze mining stocks. The scheme suggested was in all its essentials the same as this, and the conversation about it led to a meeting of some of the very persons who now figure among the conspirators before the court. The fact that the first scheme was not carried to a successful conclusion does not affect the admissibility of the evidence. It was just as competent and cogent for the purpose of proving the defendant's state of mind as it would have been if the thing had actually been accomplished. We conclude, therefore, that the evidence of Schwed was competent. It

should have been withheld, it is true, until some evidence had been given of the commission of the crime charged in the indictment, but the order of procedure was wholly within the discretion of the trial court, and we cannot see that the defendant was in any wise prejudiced by this departure from routine practice. In this connection it is pertinent to observe that we think there is no merit in the exception to that part of the trial judge's charge which referred to the conversation testified to by Schwed. When the charge is read in its entirety it will readily be seen that the jury were left in no doubt as to the purpose for which the testimony of Schwed was received. It was taken solely on the question of intent. It is also asserted that error was committed in permitting Schwed to testify that he had communicated to the defendant the opinion of a member of the Stock Exchange that the proposed transaction was criminal. Upon this point it is sufficient to say that it was just as proper for Schwed to state to the defendant the opinion expressed by a third party regarding the character of a transaction, as it was to express his own opinion. Both bore directly upon the subject of defendant's guilty knowledge and we think both were competent.

Under this head we may also dispose of another line of exceptions to evidence germane to the subject of the defendant's guilty knowledge, although his counsel very skillfully attempts to give this evidence an entirely different classification and effect. It is said that the court in allowing the district attorney to prove that some of the men with whom the defendant had previously been engaged in other business dealings had either been indicted or convicted of other crimes. The defendant was being cross-examined. Upon the direct examination he had denied, or sought to explain away, everything that tended to implicate him in the criminal features of the transaction in the case at bar. The district attorney was trying

to show that in May 1909, the defendant had been associated
with Adams (alias Fiske) and Aldhouse, both of Boston, in a
similar transaction. With reference to this Boston transac-
tion, as in the transaction at bar, the defendant was com-
pelled to admit his participation, but denied knowledge of its
criminal aspects. By dint of persistent questioning the dis-
trict attorney finally succeeded in bringing to light certain
circumstances which, in connection with the defendant's quali-
fied admissions, proved that the Boston transaction was es-
sentially similar to this transaction. It appeared that the
defendant and Persch went to the office of Moran or Seymour
where there was a scheme on foot to loan money on Heinze
stocks on notes for a year, and that the effort was to cause
the stocks to depreciate to such an extent that Heinze would
be unable to put up sufficient additional collateral to save
them from sale. The defendant was with Persch when he de-
livered to Seymour some of these stocks, and for them Persch
received Sherwood's check. The defendant would not deny
that in that transaction, as in the case at bar, Ullman was the
ostensible lender, and he admitted point blank that in that
transaction he received a commission of $5,000 for doing no
more, as he stated, than accompanying Persch to Seymour's
office. We think it was clearly competent for the district at-
torney to show that the defendant, who was posing as an in-
nocent man, had been engaged in another transaction so simi-
lar to the one at bar that it needs only the transposition of a
few names and figures to make them identical. Since the de-
fendant was stoutly protesting his innocence and throwing his
previous good character into the balance, it was also proper
to show that the defendant was associating with men like
Persch and Adams and Aldhouse, about whose antecedents he
had made no inquiry, and who were engaged in transactions
which resulted in criminal prosecutions. It should be remem-

bered that this is not a case in which the defendant or any of his witnesses were assailed by evidence of other convictions or prosecutions. The evidence was elicited solely for the purpose of proving the defendant's previous connection with other similar transactions through the agency of men whose reputations, no less than the character of the transactions, were important factors in determining whether the defendant was a victim or a conspirator. All this bore directly upon the question of defendant's guilty knowledge and the evidence was, therefore, competent.

Counsel for the defendant complain of the refusal of the trial court to charge as matter of law that Kaufmann and Birmingham were accomplices. We think the refusal to so charge was right. The court did charge as matter of law that Sherwood and Clark were accomplices, and their connection with the affair was so palpably criminal that no other charge would have been correct. It was different as to Kaufmann and Birmingham. Kaufmann had been called in as a broker under circumstances which were quite consistent with his representations to Birmingham to the effect that the Eastern Brewing Company, or Ullman, its employee, was to be the lender, and there is no direct evidence that he knew anything about the criminal plot which underlay the transaction. Birmingham knew, of course, that the Windsor Trust Company was not making the loan, but he denied that he had ever made any such representation to any one, and it cannot be said beyond peradventure that he must have known of the criminal purpose of Clark and Persch and Sherwood. In these circumstances the learned trial court rightly concluded to leave it to the jury, under proper instructions on the law, to decide whether Kaufmann and Birmingham were guilty accomplices or innocent participants; and we think no reasonable criticism can be made upon the charge in this respect.

We may here also notice another exception to the charge which is germane to this subject. The trial justice, in referring to the rule which requires corroboration of the testimony of an accomplice, said that when such testimony is corroborated by witnesses who appear to be honest and truthful it "becomes testimony of such an order as entitles you to give it great consideration, notwithstanding the fact that it is the testimony of an accomplice." Had the court instructed the jury that great consideration *must* be given to such testimony, it would doubtless have been error, for it is the sole province of the jury to determine how much weight shall be given to it. Although at first glance the language of the charge seems to suggest the idea that the court had told the jury how much credit must be given to the testimony of the accomplice, a closer view justifies a different conclusion. The learned justice said, in effect, "when the testimony of an accomplice is corroborated by witnesses who impress you as being honest and truthful witnesses, it may be of so convincing a character as to entitle it to great consideration." When this part of the charge is considered in connection with the context, it must be regarded as a fair and conservative statement of the law. So, too, we are unable to agree with the defendant's counsel in their contention that the trial justice erred in refusing to charge the 72nd request relating generally to the subject of corroboration of accomplices. As to this it is enough to say that the charge was full and fair, and the refusal to charge in the precise language of the request was not error.

The learned counsel for the defendant further insists that the court erred in refusing to charge the 45th, 46th, 47th and 57th requests. These were included in the 102 requests which had been handed to the court, but not read to the jury, and they were all to the effect that mere passive knowledge on the

part of the defendant that a felony was to be committed would not be sufficient to ascribe to him such an affirmative and active intent as to render him a guilty party. We have only to call attention to certain parts of the charge to meet this criticism. The learned trial justice charged specifically that the defendant could not be convicted unless found guilty of a criminal intent, and that his guilt must be determined on facts which show the part he had in the transaction, and not on the guilt of any other person. The jury were plainly told that they must acquit the defendant unless the evidence was convincing beyond a reasonable doubt that he actually knew the others were contemplating a larceny, and that he aided and abetted them. The court left no doubt in the minds of the jury that if they should find that " defendant had an honest belief that he was entitled to do what he did, and there was no intent to steal, there was no larceny." This, and much more, renders it certain that the defendant's rights were not prejudiced by the failure to charge in the precise language of the four requests to which we have referred.

We have already called attention to the fact that counsel for the defendant presented 102 requests to charge. According to the common practice in the city of New York these had been reduced to writing and submitted to the court in advance of the charge. At the conclusion of the charge the justice said " the defendant may have an exception to all other requests," and counsel for the defendant then inquired: " May they all go on record, and we have an exception to each one? " To this the court responded: " Certainly. The counsel have submitted to the court one hundred and two requests to charge and the court grants an exception to each and every request refused by the court on the ground that they are already covered in the charge." Defendant's counsel then added: " And the defendant takes an exception to the refusal of the

court to charge each and every request propounded by the
court," to which the court answered, " Yes."   In our discus-
sion of those requests to charge which the defendant's coun-
sel considered of sufficient importance to mention in their brief
and upon the oral argument, we have treated them as though
proper exception had been separately taken to each refusal to
charge.   In view of this disposition of the matter, the prac-
tice agreed upon by court and counsel in respect of the re-
quests to charge is merely a matter of academic interest in the
case at bar.   It is a practice, however, which we think should
not be followed by trial courts or sanctioned by our appellate
tribunals.   Nothing could more clearly illustrate the vice of
permitting a general exception to the refusal to charge a mass
of requests than the result in the case at bar.   Out of the 102
requests, counsel for the defendant have selected a number for
specific attack.   They might have chosen any number of
others, and among them some which could easily have been
modified or adapted to the case in hand if not literally correct.
The purpose of making requests should be to enable the trial
court to correct at once any mistakes that may have been made
in instructing the jury, but the practice pursued in the case
at bar renders it possible for astute counsel to raise excep-
tions purely for the purpose of an appeal.   It is never safe to
assume that a particular request has or has not been charged
until court and counsel are in accord as to what the request
actually   imports.   It   frequently   happens   that   a   request,
apparently incorrect on its face, may easily be so modified or
changed as to render it free from reasonable criticism, but
that is impossible if counsel may be permitted to defer selec-
tion and argument until the case is heard on appeal.   It
argues nothing to say that the exceptions were taken in this
general form with the acquiescence of the trial court.   That
consideration may relieve counsel from personal criticism, but

it does nothing to obviate an evil that would soon become intolerable if permitted to prevail.

Having discussed the various phases of this appeal, upon which our views are clearly at variance with the contentions of counsel for the defendant, we now pass to the consideration of a question which is at once interesting and debatable. The question is whether it is ever permissible to corroborate the testimony of a witness by proof of his prior consistent statements, and, if so, under what precise conditions. Before going into the history of the subject, as disclosed by the decisions and text writers, it will be well to see just how the question arises. The witness Clark, as has been stated, was an accomplice in the perpetration of the crime charged against the defendant. The trial court held as matter of law that he was an accomplice, and the record fully justifies the ruling. At the opening of the trial the district attorney admitted that he had promised immunity to Clark if he would become a witness against the defendant. The cross-examination of Clark by defendant's counsel was one long and persistent effort to break the force of his testimony, which bore heavily against the defendant, by showing that he was surrounded by every temptation to falsify in order to earn his recently promised immunity. After the cross-examination the district attorney offered in evidence a typewritten statement which Clark had dictated to a stenographer in the office of his attorney shortly after his arrest and about a year before he had any communication with the district attorney on the subject of immunity. This typewritten statement was in all essenial particulars the same as his testimony on the trial. The proposed evidence was objected to by defendant's counsel, but the court received it and gave the defendant an exception. This is the manner in which the question arises. The district attorney defends the ruling upon the theory that an accomplice, and

especially an accomplice who has been promised immunity, is always under a suspicion of discredit, implied from his interest to screen himself and to secure the conviction of his associates, and that it is, therefore, competent to corroborate him by showing that at some time anterior to the period when the a statement which is consistent with his sworn testimony. This temptation to falsify may be deemed to have arisen he made was the view taken by the learned Appellate Division, as expressed in the opinion of Mr. Justice Scott upon the authority of Matter of Hesdra (119 N. Y. 615) and Robb v. Hackley (23 Wend. 50).

Matter of Hesdra was a contest over a will alleged to have been fabricated by one O., a witness thereto, after the death of the testator. The contestants gave evidence of declarations of O., who was dead at the time of the trial, to the effect that the testator had made no will, and it was held competent for the proponents to prove in reply that O. had made declarations in the lifetime of the testator to the effect that the latter had executed a will. At first glance the case of Robb v. Hackley (*supra*) seems to be an authority against the district attorney's contention in the case at bar, but a careful reading of the opinion reveals Judge Bronson's recognition of the very exception to the general rule which is relied upon to sustain the ruling in the case at bar. In the *Robb* case the question was whether a note had been given and received in satisfaction of a debt. Evidence was given tending to show that the plaintiffs and their agent had admitted that the note had been taken in discharge of the debt. There the plaintiffs were allowed to show that their agent had previously written them a letter in which the transaction was described just as the agent had stated it in his testimony. The evidence was received, but on appeal was held incompetent, and for obvious reasons. The evidence was merely confirmatory of the testimony of a wit-

ness who had not been impeached, except by the usual contradiction inherent in a different version of the transaction. This case of Robb v. Hackley has frequently been referred to as overruling the earlier case of People v. Vane (12 Wend. 78) relating to the same subject, and it is, therefore, important to ascertain just how far the *Robb* case went. That the decision is justified by the facts no one will deny, and it was with reference to those facts that Mr. Justice BRONSON adverted to the ancient but long-exploded doctrine that the testimony of any witness could be confirmed by proof of prior consistent statements. Let us note, however, what the learned jurist had to say about a case like the one at bar. " The referee was probably governed, in receiving the evidence, by the language of the late learned chief justice in People v. Vane (12 Wend. 78) ; but that case does not necessarily go beyond deciding, that the testimony of an *accomplice* in crime may be corroborated, by showing that *when first arrested* he gave the same relation of the facts which he had given on oath upon the trial. The fact that the accomplice was called as a witness for the people, gave rise to the inference that he was criminating the defendant for the purpose of exempting himself from prosecution for the larceny. It might, therefore, be proper to show that he had given the same account of the matter *at a time when there was no such motive* for making a false accusation. If, when first arrested, *and when he had no expectation of personal exemption,* he had frankly disclosed the whole matter, that might tend to confirm his subsequent repetition of the same statement an oath. *This brings the case within an acknowledged exception to the general rule, that the testimony of a contradicted, impeached or discredited witness cannot be confirmed by proving that he has made similar declarations out of court.*" (p. 53.) This language could not be more apt if it had been written expressly for the case at bar. Upon ex-

amination of the case of People v. Vane (*supra*), where evidence of this character was received, it must be admitted that Chief Justice SAVAGE stated this rule, or rather this exception to the general rule, much more broadly than was necessary for the facts of that case, for there the witness who was thus corroborated by his previous statements was an accomplice, just as Clark is in the case at bar. The real point of the matter is that People v. Vane decided that in a case where a witness is an accomplice he may be corroborated by proving his prior consistent statements made at a time when there was probably no temptation to falsify; and this decision was not disturbed by the subsequent holding in Robb v. Hackley, where the exception to the general rule, on which People v. Vane is based, was expressly recognized. And that was the view of the effect of Robb v. Hackley, taken by this court in Gilbert v. Sage (57 N. Y. 639), and by the General Term in Hotchkiss v. Germania Fire Ins. Co. (5 Hun, 90, 95), and in Herrick v. Smith (13 Hun, 446, 448). The case of People v. Collier (141 App. Div. 111, 113; 25 N. Y. Crim. 213) is not an authority upon this question, for there the record discloses no change in circumstances between the time when the complaining witness made his statement to the magistrate and the time of the trial. The court simply received the complaint made to the magistrate in corroboration of the complainant at the trial, and it was properly held that there was no foundation for the evidence.

When we turn from the decisions in this state we encounter an apparent diversity of authority, with a large preponderance in weight and number in favor of the admission of such evidence, and a small minority against its admissibility, but all conceding the existence of the one exception to the general rule which we think applies to the case at bar, namely, that when the witness rests under the imputation of a recently formed

motive to falsify, it may be shown that he made similar state-
ments at a time when the imputed motive did not exist, or when
motives of self-interest would have induced him to make a
different statement from that which he actually made. And,
therefore, a confession by an accomplice given before he has
received a promise of personal exemption if he will become a
state's witness, may well be received as corroborating the testi-
mony given by him on the witness stand. (Thompson on
Trials [2nd ed.], sec. 574 *et seq.*; citing Robb v. Hackley,
*supra*; French v. Merrill, 6 N. H. 465; State v. Twitty, 9 N.
C. (2 Hawks) 449; State v. Petty, 21 Kan. 59; Elliott on Evi-
dence, sec. 994; Wharton on Crim. Ev. [10th ed.] vol. 1, sec.
492; State v. Vincent, 24 Iowa, 570; State v. Flint, 60 Vt.
304; Stolp v. Blair, 68 Ill. 544; Wigmore on Ev. vol. 2, sec.
1128; 3 Ency. of Ev. 736; Waller v. People, 209 Ill. 284;
Barkly v. Copeland, 74 Cal. 1; Griffin v. City of Boston, 188
Mass. 475.) An examination of the authorities included in
this long array will show that in most of them evidence of this
character has been held admissible upon the true theory that
it tends to support the integrity of the witness, no less than the
accuracy of his recollection, where he has been impeached by
evidence showing that he has testified under corrupt motives
or has recently fabricated his testimony to meet the exigencies
of the case (City Pass. Ry. Co. v. Knee, 83 Md. 79), and the
limitations under which it should be received are well stated in
Maitland v. Citizens' Bank (40 Md. 540) where Judge ALVEY
said: " The evidence   *   *   *   is not admitted to prove or
disprove any fact involved in the issue on trial, but simply to
corroborate or support the credibility of the witness who may
be in some manner impeached." On the other side of the ques-
tion the decisions either distinctly admit that evidence of this
character is competent in a case like this, or they show upon
examination that they are not within the particular exception

to the general rule. In Conway v. State (33 Tex. Crim. Rep. 327) the charge was burglary. There the court received evidence to sustain the credit of a co-principal by proving similar statements made by him after immunity had been promised him, and it was held on appeal that the evidence had been improperly received. But the appellate tribunal qualified its ruling by stating that when " an attempt has been made to prove or show that a witness is testifying under improper motives or influences, then, indeed, the party whose witness he is may prove that he made similar statements *before* he could have been affected by such influences, motives or inducements." To the same effect is People v. Doyell (48 Cal. 91) where the defendant was prosecuted for murder. In that case it was held that the credit of the witness, whom it was sought to impeach by showing that he had previously made statements at variance with his own sworn testimony, could not be sustained by evidence tending to show that he had also made to various persons the same statements to which he testified at the trial. The principle which we are applying in the case at bar was, however, distinctly recognized by the court in the following language: " Such statements made by the witness may, however, be admissible in contradiction of evidence tending to show that the statement made by him under oath is a fabrication of a late date if the statements were made before their effect could be foreseen; and perhaps in other peculiar cases." In Commonwealth v. Tucker (189 Mass. 479) it was held that it was not proper to corroborate a witness for defendant in a homicide case after the prosecution had sought to impeach him by his prior statements inconsistent with his testimony by showing that he had also made earlier consistent statements. And the reason for the ruling is apparent. The witness was unimpeached except by the evidence which contradicted his testimony, and it could add nothing to his sworn statement to

prove that he had previously made a similar unsworn state-
ment. On the other hand, in a larceny case (Stewart v.
People, 23 Mich. 63), Mr. Justice COOLEY wrote for a court
which held that in a case where there was conflicting evidence
whether a witness made previous statements which were at var-
iance with his testimony, it was competent to show that at an
earlier time he had made a written consistent statement un-
der conditions which were free from suspicion. On a prose-
cution for murder committed on the high seas, where the
defense was insanity (U. S. v. Holmes, I Clifford U. S. Cir.
Rep 105), it was held incompetent to fortify a witness who
had testified to facts indicating the insanity of the defendant,
by showing that he had previously stated these facts to mem-
bers of the defendant's family; and in an action for damages
for personal injuries resulting in permanent disability (Reed
v. N. Y. C. R. R. Co., 45 N. Y. 574) it was shown by the de-
fendant that several months after the injury the plaintiff had
performed physical and mental labor. There this court held
that the plaintiff should not have been permitted to testify
that at the time he performed this labor he complained of be-
ing ill to a person who was casually present. Thus when we
analyze these few cases which are cited as being authorities
against the use of testimony to corroborate a witness under the
imputation of recent improper influence or motive, we find
that none of them touch the particular exception to the gen-
eral rule under which such corroborating testimony has al-
ways been held proper, and some of them expressly admit the
existence of the exception.

The confusion in the authorities upon this subject is easily
accounted for when we consider its history. Until the 18th
century such corroborating evidence was received generally
in all cases, even where the witness had not been discredited in
any way. (Lutterell v. Reynell, 1 Mod. 282 [1682]; Haw-

kins P. C. book 2, p. 607; 1 Greenleaf Ev. 605.)    This was
a rule well calculated to promote the trial of incidental issues,
but it also lacked the support of sound reason.    In the light of
our modern experience it is obviously a mistake to suppose
that an untrustworthy story can be made trustworthy by
proving numerous repetitions of it; and equally illogical does
it appear to be to attempt to support a credible witness and
reliable testimony by any such broken reed.    In the early part
of the 18th century the courts began to see the inconsistencies
of this practice.    In Rex v. Parker, decided in 1783 (3 Doug.
242; republished in 26 Eng. Com. L. Rep. 95), which was a
prosecution for perjury, the deposition of a deceased witness
was received in evidence, and then, on the cross-examination
of a prosecutor's witness, he was permitted to swear to certain
declarations of the deceased witness, not under oath, for the
purpose of corroborating the facts stated in the deposition.
Mr. Justice BULLER, who spoke for the court, simply an-
cited to show that the old English rule applied in the *Lutterell
v. Reynell* (*supra*) and the statement of Hawkins was no lon-
ger the law.    This dictum has been widely and frequently
cited to show that the old English rule applied in the Lutterell
case has been entirely swept away, just as our own case of
Robb v. Hackley has been cited on both sides of the question.
Thus, for instance, a well-known author cites Smith v. Stick-
ney (17 Barb. 489) as following the Robb case in holding such
evidence incompetent; and when we refer to the case itself we
see that it only decides that a witness who has been impeached by
evidence of prior inconsistent statements cannot be fortified
by showing that he has on other occasions made statements
which were identical with his testimony.    And here again we
find that Mr. Justice WELLES recognized the exception to the
general rule, for he said:    " We can perceive nothing in the

present case to bring it within the exception to the general rule." In the effort to arrive at a proper decision upon this troublesome question we have written at much greater length than was at first thought necessary and for the reasons given we conclude that the evidence of Clark's prior consistent statement was competent to support his testimony, upon the ground that he was impeached by the imputation of having sworn to a recently fabricated story from motives of self-interest. Upon principle and authority we regard that as one of the sound exceptions to the general rule that a witness may not be corroborated by what he has himself previously said.

The only remaining exceptions can be quickly disposed of. The witness Birmingham was allowed to testify, under objection and exception, that he had previously appeared before the grand jury, where he had testified concerning the same matter of which he was giving evidence at the trial. Here it is to be noted that his testimony before the grand jury was not produced or offered in evidence, nor was the witness permitted to state what he had sworn to, and the court flatly refused to allow him to state that his testimony before the grand jury was the same as at the trial. Surely the fact that he had testified before the grand jury, and that he had there been interrogated on the same matter as at the trial, was not prejudicial to the defendant, and yet that is all there is of the incident, as is clearly shown by a careful analysis of the questions put to him and the answers which he made. In this view of the matter it is unnecessary to go into further detail for the purpose of showing that Birmingham was in precisely the same position as Clark, and that his testimony before the grand jury, if properly proved, would have been competent to show that he then told the same story as he repeated at the trial. It suffices to say that we have not that question before us.

The judgment of conviction should be affirmed.

CULLEN, Ch. J., WILLARD BARTLETT and CHASE, JJ., concur; HISCOCK, COLLIN and HOGAN, JJ., dissent.

Judgment of conviction affirmed.