(165 App. Div. 626)

PEOPLE v. HUDSON VALLEY CONST. CO. et al.   (No. 323–24½.)

(Supreme Court, Appellate Division, Third Department.   January 6, 1915.)

1. CRIMINAL LAW (§ 112*)—PROSECUTION—VENUE.
      Where a corporation, constructing a state prison in W. county under a contract whereby it was to be paid the net cost thereof and a commission, presented in that county to the deputy state architect for his certification false statements as to the cost of labor and materials, and upon such false statements prepared and presented in A. county a false voucher, by means of which it obtained money from the state in A. county, the offense was committed partly in each county, and the corporation can be prosecuted in W. county.
      [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 220–226, 230; Dec. Dig. § 112.*]

2. WITNESSES (§ 304*)—PRIVILEGE—SELF-INCRIMINATION—CORPORATION.
      Const. art. 1, § 6, providing that the defendant in a criminal case shall not be compelled to be a witness against himself, and Code Cr. Proc. § 393, providing that the failure of accused to testify shall create no presumption against him, create privileges personal to the accused, and do not apply to the testimony or failure to testify of the officers of a corporation which is accused of a crime.
      [Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1051, 1052; Dec. Dig. § 304.*]

3. FALSE PRETENSES (§ 49*)—EVIDENCE—SUFFICIENCY.
      In the prosecution of a corporation for obtaining money from the state by a false voucher, evidence *held* sufficient, in the absence of any testimony on behalf of defendant, to sustain a conviction.
      [Ed. Note.—For other cases, see False Pretenses, Cent. Dig. § 62; Dec. Dig. § 49.*]

4. CRIMINAL LAW (§ 371*)—EVIDENCE—OTHER OFFENSES.

In the prosecution of a corporation, which was constructing a state prison under a contract providing that it should receive the net cost with a commission, for obtaining money of the state by means of a false voucher as to the work and material put into the building, evidence of specific items which were falsely included in statements made to the deputy state architect or of items of credits which were omitted therefrom, though showing the commission of another crime, is admissible to meet the defense of Penal Law (Consol. Laws, c. 40) § 1306, which provides that it shall be sufficient defense to a charge of larceny that the property was openly taken under a bona fide claim of title, though the claim was unfounded, as showing that the false voucher was not presented in good faith, but as a part of a scheme to defraud the state.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 830–832; Dec. Dig. § 371.*]

5. FALSE PRETENSES (§ 42*)—EVIDENCE—ACTS OF AGENT.

Evidence that the workmen shirked their work under orders from their bosses, and declarations of the workmen, though in connection with acts for which the defendant was not directly responsible, were admissible, in connection with the other evidence, to show a scheme to defraud.

[Ed. Note.—For other cases, see False Pretenses, Cent. Dig. § 56; Dec. Dig. § 42.*]

6. CRIMINAL LAW (§ 410*) — EVIDENCE — MATERIALITY — KNOWLEDGE OF DEFENDANT CORPORATION.

Evidence that the defendant's superintendent knew that the engineer was not at work on a day for which his time was charged, and that he required a workman, who had stated that his time check was made for the wrong job, to sign a statement that he did not know where the different jobs were, and told him he could continue to work if he kept his mouth shut, is also admissible to show knowledge by the defendant, through its officers, that work was being fraudulently charged for.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 897, 1254; Dec. Dig. § 410.*]

Howard, J., dissenting.

Appeal from Trial Term, Washington County.

The Hudson Valley Construction Company and others were indicted for grand larceny. From a conviction thereof in the second degree, the Construction Company appeals. Affirmed.

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD, and WOODWARD, JJ.

Thomas S. Fagan, of Troy (Edgar T. Brackett, of Saratoga Springs, of counsel, and Wyman S. Bascom, of Ft. Edwards, and George N. Nay, of Hudson Falls, on the brief), for appellant.

Erskine C. Rogers, Dist. Atty., of Hudson Falls, for the People.

JOHN M. KELLOGG, J.   The indictment grows out of the construction by the defendant, under contract with the state, of the Great Meadow Prison at Comstock, Washington county, N. Y.   The defendants, its president, its superintendent in charge of the work, its inspector of material, its timekeeper, its paymaster and auditor, and also the superintendent of state prisons, the state architect, and the deputy state architect, were jointly indicted.   The defendant had a separate trial.   The offense charged is grand larceny in the first degree, committed partly in Albany county and partly in Washington county.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The original contract between the state and the defendant provided for the construction of certain buildings upon a percentage basis, by which the state was to pay the net cost of the construction, with a profit to the defendant of 5 per cent. thereon, and also 2 per cent. in addition for office expenses. Other buildings and work were added by other contracts, under some of which the work was done by defendant under a commission plan, and upon others it was to do the work for a lump sum. The dormitory was receiving its roof May 4, 1910, when it was discovered that the southwest corner of the building was cracked and settled, and that immediate action was necessary to preserve the work already done. The state authorities and the defendant took the matter up, and after various negotiations it was agreed that the defendant was to repair the dormitory as required, and was to receive the net cost thereof with a profit of $7\frac{1}{2}$ per cent. and $2\frac{1}{2}$ per cent. for office expenses. The defendant completed the work and received therefor $41,011.51, the last installment of which $4,026.67, was paid on or about January 5, 1911, upon vouchers executed by its treasurer and President Boland, and it is charged that such vouchers were false, and that the obtaining of the payment of said last installment was grand larceny in the first degree, under sections 1290 and 1294 of the Penal Law, and that the defendant, with intent to deprive and defraud the state of New York of its property and of the use and benefit thereof, and to appropriate the same to its own use, wrongfully, unlawfully, and feloniously obtained said money from the state by color and aid of false tokens or writings, and that the other defendants were parties to the crime. Appellant was found guilty of grand larceny in the second degree, which necessarily means that from $50 to $500 was obtained in the manner charged. The theory of the people was that this defendant, to its knowledge, had been paid more than the net cost of all the work and commissions before the vouchers for the last installment was presented, and that the last payment therefor was money not due from the state, but was obtained by false and fraudulent papers and tokens presented by defendant.

[1] The appellant has challenged from the beginning, and now challenges, the whole proceeding, upon the ground that the crime, if any, was committed in Albany county, and not in the county of Washington, or within 500 yards of the county line. Concededly the immediate voucher upon which the money was paid was prepared and sworn to, and the check drawn and used, by the defendant in Albany county. The contract provided that the contractor was to furnish to the state architect a monthly statement of all the materials and work furnished during the month, accompanied by original receipted bills for all materials from the manufacturers or dealers, with all discounts deducted, and submit all time books and salary accounts for all men employed on the work, and receipted vouchers for all miscellaneous charges. The state architect had a representative upon the ground at Comstock, who had an office there for the transaction of business, and monthly, as required by the contract, the defendant furnished at said office the statement required, together with the time books and salary accounts and other data, which were properly examined by the representative of the architect and certified by him; one copy being

retained in the office and the other furnished to the defendant. Upon these statements so certified the state architect acted at Albany in making up and passing the voucher, which was sworn to by the defendant's president or treasurer at the time the draft was delivered. The accounts of the appellant were kept in Washington county, and the acts were there done which alone made possible the fraudulent vouchers resulting in the overpayments.

The evidence shows that the presentation of the monthly statements of material, of work, and the salary account, and the receipted vouchers, at the architect's office at Comstock, was necessary before a voucher would be approved upon which the checks were to issue. We think, therefore, it was fairly established, as charged in the indictment, that the crime was committed partly in Albany county and partly in Washington county, and that the money was obtained by reason of false tokens and writings made and delivered in Washington county, which were a prerequisite of defendant's obtaining the money from the state.

[2] The defendant rested its case upon the people's evidence, and the court charged the jury in part as follows:

"Now, perhaps, we should state that the defendant is a corporation. It could not be sworn as a witness. It could only appear through its officers and agents. The defense elected to stand upon the case made by the people, and the fact that the defense elected to stand upon the case made here, or the case which the people claim to have made, is nothing against the defendant, and is not to be taken against it in any sense whatever. They have a right to come to you and say: Gentlemen, we contend the case is not proven, and we stand upon that, and because they did not produce evidence of the defendant's guilt. Of course, if there were witnesses in court, and you should so determine, that the defense might have called, who could have explained certain facts, and such witnesses were not called, you might and you could, if you so determined, presume from that that the witness would not testify favorably to the defendant. But do not let the idea that the defendant did not call witnesses injure the defendant or prejudice it in your mind or minds."

It is now urged that Boland, the president of the defendant, and Gallagher, its secretary, were in court and sworn by the people as witnesses, and that the latter part of the charge called the attention of the jury to the fact that they had not been sworn, and permitted it to draw inferences against the defendant on account of their silence, in violation of the provisions of Const. art. 1, § 6, that a defendant in a criminal case shall not be compelled to be a witness against himself, and of section 393 of the Code of Criminal Procedure, which provides that the neglect or refusal of a defendant in a criminal case to testify shall not create any presumption against him. The defendant, as an artificial person, had no knowledge of the facts relating to the false vouchers or frauds which were being perpetrated upon the state. Knowledge is attributed to it by law because the agents, by whom alone it could act, were doing the wrong in its business and for its benefit. The defendant itself could not be a witness. The inference from the charge was that, if any witness in court whom the defendant might have called to explain certain facts which the jury felt required explanation was not called, it might infer, if it thought proper, that the witness would not testify favorably to the defendant.

In his summing up the district attorney, in substance, stated that no one had testified that Boland did not know about certain of the irregularities, and inquired if Boland would not know all about them. The appellant excepted to such remarks. The privileges given by these sections do not relate to an agent of the defendant, or to persons acting with him. One of several persons jointly committing a crime may voluntarily appear and testify against the other. If Boland or Fitzgerald were on trial, neither could be compelled to testify against himself, but either might voluntarily incriminate the other. That a person need not incriminate himself is a privilege personal to the witness; that a defendant cannot be compelled to give evidence against himself in a criminal case is a privilege personal to him. None of the officers or agents of the defendant can refuse to testify because their evidence might tend to convict it, nor can the defendant raise such objection in its own behalf.

"The right of a person under the fifth amendment (U. S. Constitution) to refuse to incriminate himself is purely a personal privilege of the witness. It was never intended to permit him to plead the fact that some third person might be incriminated by his testimony, even though he were the agent of such person. A privilege so extensive might be used to put a stop to the examination of every witness who was called upon to testify before the grand jury with regard to the doings or business of his principal, whether such principal were an individual or a corporation. The question whether a corporation is a 'person' within the meaning of this amendment really does not arise, except, perhaps, where a corporation is called upon to answer a bill of discovery, since it can only be heard by oral evidence in the person of some one of its agents or employés. The amendment is limited to a person who shall be compelled in any criminal case to be a witness against *himself*, and if he cannot set up the privilege of a third person, he certainly cannot set up the privilege of a corporation." Hale v. Henkel, 201 U. S. 43, 69, 26 Sup. Ct. 370, 377 (50 L. Ed. 652).

In N. Y. L. I. Co. v. People, 195 Ill. 430, 63 N. E. 264, an agent of the insurance company was permitted to testify, in a suit to recover a statutory penalty, to facts establishing the guilt of the company.

[3] It is urged that the verdict is not sustained by the evidence. Two witnesses were called, who, to a certain extent, qualified as experts, and, after examining the work as it was when completed, gave details and figures showing that the work could not have cost $10,000, and they gave the quantities and qualities and prices of material going into the construction, with the estimated cost of labor and everything entering into the work. The credibility of one of them was fairly subject to criticism. We need not give full credence to all they said; we need not assume they were the most competent experts who could be called upon in the matter in question. They gave their estimates, and the reasons for them. In addition various abuses were proved which related to this work. Overcharges of the time of men and for material, time and material used upon the lump sum contract were charged against this contract, unnecessary men were employed at excessive wages, the men were idling away their time, many credits which should have been given the state were omitted, and many other facts and circumstances (too many to be detailed here) which tended to show that the defendant was defrauding the state by means of its contract and the vouchers which it was presenting. The evi-

dence indicated that the defendant was purposely making this commission work cost as much as it could for the purpose of swelling its commissions. These various incidents, together with the evidence of the alleged experts and the absence of all explanation, were persuasive evidence that the defendant was illegally obtaining moneys from the state as charged. At least there was sufficient evidence to put the defendant upon its defense. It could by measurement have shown the amount of cement and material in place, and could approximately have shown the amount of labor required for the work, and competent experts, by showing how the work was done and by critical examination of it, could give a reasonable judgment as to the actual cost of it in the manner in which the state required it to be done. If the evidence of the experts as to the actual cost of the work was not of the most satisfactory nature, it must be remembered that the defense furnished no evidence upon the subject, and many earmarks indicated that the contract had not been honestly performed and that false accounts were rendered the state.

[4] The defendant also urges as a ground for reversal that many acts were proved which did not relate to this particular contract, which in substance were crimes in themselves as proved, and that the defendant, while being tried for one crime, has been prejudiced by evidence that other crimes were committed, not by the defendant corporation itself, but by some of its employés, officers, or servants. Under the indictment the people were required to prove that the defendant knowingly obtained the money from the state by false and fraudulent vouchers, and also had to face the statutory provision (section 1306 of the Penal Law) that:

"Upon an indictment for larceny it is a sufficient defense that the property was appropriated openly and avowedly, under a claim of title preferred in good faith, even though such claim is untenable."

It was shown by the vouchers presented to the representative of the architect upon the ground that 200 barrels of lime were used in this work. The evidence shows clearly that not one barrel was used. This did not necessarily convict the defendant of a crime. The lime may have been bought for use upon one of the other contracts relating to the prison, where a lump sum was to be paid, and by mistake might have been charged to this job. Each of the other incidents tending to show wrong, if standing alone, might be met by the same answer, and many of them together might be disposed of in the same way. It therefore became necessary for the plaintiff to prove that the defendant's acts were done in carrying out some scheme for defrauding the state. Where the intent with which an act is done is not clear in itself, and it is necessary to show the particular intent, other acts at about the same time, of a similar nature, under like circumstances, even though constituting a crime in themselves, may be shown, not for the purpose of proving that the defendant has probably committed this crime, because he had committed others, but for the sole purpose of characterizing the intent or purpose in doing the act charged. People v. Katz, 209 N. Y. 311, 103 N. E. 305; People v. McKane, 143 N. Y. 455, 38 N. E. 950.

[5] The acts of the defendant's agent, if committed without its knowledge or consent, cannot convict it of crime. The court so charged. But here the acts that were committed by subordinates were of the same character and quality, upon the same work, and for the same purposes as the acts which the immediate representatives of the defendant were committing or permitting. These acts were not proved as separate independent acts of employés, but were proved as a part of the res gestæ, showing how the work was being done and the manner of its progress. If men were told by their bosses not to hurry, to take their time, and the officers and the immediate representatives of the company knew that the men were idling away their time and not faithfully working, such declarations in themselves are of little importance, but may be considered as characterizing the work, and as a part of it. In other words, the men did not work well, because they were acting under orders to that effect. The various facts disclosed were such that the defendant and its officers must have realized the situation, and the men must have been carrying out the orders of the company, or doing the various acts with its permission and consent. Many of the wrongful acts shown were not committed in straightening up and rebuilding the wall of the dormitory under the contract in question. They all, however, took place at the Great Meadows Prison, which was being built by the defendant for the state, mostly upon the commission plan. There were different contracts, but each in a manner was supplementary to the others. But one work was being done, the construction and equipment of the prison. So that in a way none of the matters shown were entirely foreign to and outside of the particular offense charged. In a way they related to and formed a part of the same general transaction. And while all the acts were not of the same nature or same class of wrong, each when connected with the others tended to show that the defendant under its contracts with the state relating to this prison at this time was intentionally defrauding the state. The evidence tended to show that improper credits were given the state for items which the defendant received from the state under an understanding that the credit was to be given. The defendant cut hay from the premises and was to credit the state with its value. It omitted a credit of over $500. It is alleged that this evidence proved, if anything, a stealing of the hay, a crime of a different character than the one under trial. The charge, as the people were proving it, was that the hay was properly taken, but by putting in a fraudulent voucher as a credit the defendant was enabled to obtain from the state $500 in money which it otherwise could not have obtained.

[6] The architectural engineer received $12.50 for a day when he was not engaged upon the work. During his absence, Collier, the inspector of the State Architect, inquired of the defendant's superintendent where the engineer was, and received answer: "It is raining this morning; I suppose he didn't come up." The reception of this evidence was not error. It was material, as tending to show that the defendant knew it was paying for work not done.

Time checks given to the witness McGarr satisfied him that some of

his time was charged against this contract which rightly belonged to one of the other jobs. The superintendent called all the laborers into his office, and asked them if they had ever received any checks which they thought were incorrectly marked, and then asked McGarr in person, who stated that he thought he had. The superintendent then asked him if he knew where the different jobs on the work, naming them, were, and he admitted he did not know some of the jobs named. The superintendent told him that he was incompetent to say whether the checks were correctly or incorrectly marked, and prepared and had him sign a writing stating where his time for the preceding week had been distributed, and certifying that he was incompetent to judge whether or not the amounts were properly distributed. Later McGarr asked the superintendent if he could be continued on the job during the winter, and he replied: "I could if I would keep my mouth shut on what I saw and what I heard." This evidence, in connection with the other testimony of McGarr, bore upon the question whether the defendant, through its officers, knew that the men were paid for work on jobs where they had not worked, and the fact tended to prevent any inquiry in that respect. It also indicated that the defendant and its officers knew what was transpiring upon the job and were trying to keep it secret.

The people attempted to show that the settlement of the wall resulted from defendant's fault. The attempt failed. But in making proof it appeared that concrete was being put in soft, wet ground. Hubbard heard Hennessey, the foreman, say at the time to Hammel, the superintendent, that he thought it was a shame to put the stuff in there in the condition in which it was, to which Hammel replied: "We got our orders to do it, so go ahead; it is up to them." This declaration may be considered as characterizing and forming a part of the work, and tended to show a knowledge of the defendant and its officers that the work was being improperly performed. At the time the evidence was introduced it was competent, as bearing upon the question then under consideration.

The different wrongs relating to this prison work, when associated, tend to characterize the defendant's acts, and indicate that in completing this prison it was seeking every opportunity to obtain money not justified by its contract, and that the particular wrongful charges made by the defendant against the state were not made in good faith, but with the intent of illegally obtaining money from it.

We find no error calling for a reversal of the judgment. So many facts appear tending to show the commission of the crime as charged that it would see a triumph of technicality over substance if this judgment could be reversed on account of the admission of testimony relating to incidents trivial in themselves. The case as submitted to the jury, aside from any questionable declarations or incidents, could not have resulted otherwise than it did. The charge was remarkably full, clear, and fair.

The judgment of conviction should therefore be affirmed. All concur, except HOWARD, J., who dissents.