### PEOPLE v. UEBELMESSER. (No. 7400.)

(Supreme Court, Appellate Division, First Department. June 18, 1915.)

CRIMINAL LAW ☜1169—HARMLESS ERROR—ADMISSION OF EVIDENCE.

     Where the evidence, properly admitted, conclusively showed that a conviction was just, the admission of alleged incompetent evidence, if error, was harmless.

     [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 754, 3088, 3130, 3137–3143; Dec. Dig. ☜1169.]

     Dowling, J., dissenting.

Appeal from Court of General Sessions, New York County.

Charles R. Uebelmesser was convicted of grand larceny in the second degree, and appeals. Affirmed.

See, also, 152 N. Y. Supp. 1134.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, DOWLING, and HOTCHKISS, JJ.

Martin W. Littleton, of New York City, for appellant.

Robert S. Johnstone, of New York City, for the People.

SCOTT, J. I feel constrained to vote for an affirmance of this conviction notwithstanding the admission of the testimony as to the value or lack of value of the New Jersey lots. It is quite true that Uebelmesser did not make any specific representations to the complaining witness as to the value of the lots given as security for the money invested in the fraudulent enterprise, and that he said that it was not worth the amount of the stock subscribed for, but the mere fact that it was given as security for a substantial sum of money invested in the enterprise, and that Uebelmesser stipulated that the lots were to be redeeded, implied a representation that the lots were worth something. In point of fact it was shown that they were worth nothing, or practically nothing. This, I think, may fairly be classed as a false and fraudulent representation tending to establish the fraudulent character of the enterprise into which the complaining witness was induced to put his money. To be sure there was more than ample evidence of the fraudulent nature of the scheme outside of the testimony concerning the value of the lots, and it may be said that that testimony was unnecessary. But I cannot say that its admission, even if it had better been left out, is a sufficient error to require the reversal of a most just conviction.

The judgment should be affirmed.

INGRAHAM, P. J., and CLARKE and HOTCHKISS, JJ., concur.

DOWLING, J. (dissenting). The appellant herein has been convicted of the crime of grand larceny in the second degree. The com-

plaining witness, Harold Woffinden, had been a stenographer in England, and in this country had taught English in some business schools. He answered an advertisement in the New York Times in June, 1912, and received in reply a letter, signed by W. Wenderhold, the codefendant, asking him to call, and saying that the writer's proposition was one that "ought to suit the most conservative and critical." Upon calling he first met Wenderhold, who said the advertisement referred to the American Transporal Company, which was engaged in the manufacture of stains, varnishes, enamels, and polishes made from a secret formula invented by the defendant, Charles Uebelmesser, who was an expert chemist; that they had more business than they could take care of among themselves, the concern then consisting of Uebelmesser, Wenderhold, and one Walter Thompson; that they were keenly anxious to get hold of a smart, capable man to take charge of the sales management, which was then in the hands of Wenderhold, who was anxious to take over the factory end of the business, and that the witness was to gradually succeed him. Wenderhold showed witness a book containing what he said were orders received from some of the biggest firms in New York, naming specifically Abraham & Straus, Simpson, Crawford Co., and Jacob Ruppert. He said the company was capitalized for $100,000, and that he and Uebelmesser were the owners of $19,000 or $20,000 of stock, representing money to that amount actually put in by them, and that they were in good financial condition, and only required the services of a capable man. When the witness inquired why they wanted an investment of $600 Wenderhold replied that it was merely to be invested as evidence of good faith and active interest in the concern, and in response to a query if they were actually in need of funds, said, "No," that all they wanted was the service of a bright man. The witness inquired as to the nature of the formula, whereupon Wenderhold said that it was a secret, and known only to himself and the inventor, and that he could not tell witness what it was, but the formula was safely deposited, and arrangements had been made for its accessibility in the event of the withdrawal of either of them, and that goods made from the formula had been submitted to various tests; articles coated with the product had been immersed in acid; that they had been subjected to water tests, and to tests of heat and cold, and had withstood them all. Uebelmesser then made his appearance, was introduced as the inventor of the formula, and joined in the conversation, saying that, as they had an English business and a London office, Woffinden might eventually go to England and handle that end of the business. He told the witness that they had been in business about a year, and Wenderhold said that they had made sufficient profit to pay a dividend of 10 per cent. on the stock, which money had been put back into the treasury. Then Woffinden asked what sort of security he might have if he invested his money; that he did not care to put in $600, but could invest $500, to which Uebelmesser said that he would give him a deed to some real estate owned by his wife. A contract was then exhibited to witness by Wenderhold, which the former read through rapidly, and it was then suggested that he might like to look through the warerooms, so a trip was made to them, the contract being

handed to the witness in order that he might take it away with him and examine it at his leisure. The force in the warerooms consisted, at the time he was taken there, of two boys sticking labels on cans and pouring out liquids. Nothing was said by Uebelmesser at this time as to the land in New Jersey that his wife owned. Witness inquired as to who Walter Thompson was, and Uebelmesser replied that he was the president of the company, a financial man in Wall Street, with any amount of credit, and any time they wanted money it was easy to get it through Thompson's good offices; that he was graduate of Harvard and a man of excellent reputation. Several days afterwards Woffinden noticed a clause in the contract stating that the company desired money for the purchase of material, and called Wenderhold's attention to it over the telephone, reminding him that he had said they did not want money but the services of a man, whereupon Wenderhold reiterated that that was so, and that the clause was simply a statement of the way in which the money was to be expended. At the same time, Woffinden asked what salary he was to be paid, since he was at that time in a good position, to which Wenderhold replied "$25 a week," which was satisfactory to the other. Wenderhold also told him that the market value of the stock was $10 a share, but that since the witness was coming in early, he could get it for $5 a share. Thereafter, and within a few days, Woffinden met both the defendants at the company's office, and they confirmed the promise as to salary made over the telephone. Shortly thereafter, they had another interview, and the contract was finally signed. Before signing it, Woffinden said he was willing to enter into the contract, provided the deed which was promised was forthcoming. Thereupon Wenderhold handed him a deed to 10 lots in New Jersey, at which the witness remarked: "I thought Mr. Uebelmesser was to give me a deed to some property owned by his wife." Uebelmesser replied that, so long as Woffinden got a deed, it didn't matter very much from whom he got it, if the title and property were good, to which proposition witness agreed and signed the contract. Up to this time nothing whatever had been said as to the value of the property in New Jersey, nor was anything thereafter said to Woffinden as to its actual value. Uebelmesser had said, however, before the contract was signed, that the deed was to be held by Woffinden until such time as he was satisfied with the way things were going and with what he was getting out of the concern, say, for six months, after which time he was to surrender the deed to Wenderhold. Before signing, Uebelmesser also stated to Woffinden that, as they had been making profits constantly for the past year, there was no actual danger of his failure to draw the $25 a week. In answer to the question as to whether anything was said by either of the defendants as to the value of the property represented by the deed, he said:

"They told me it was not equal to the amount of the stock, but it was given to me as evidence of good faith on their part, and was to be returned to them."

He was further asked the explicit question: "Did they make any statement as to what the lots were worth?" to which he answered "No, sir." The deed having been offered in evidence, a question was put to

him in the following form: "Now, as I understand it, the deed was given to you as security for the money you had put in. Is that right?" And he answered, "Yes, sir." Whether this was merely his conclusion, or whether it was based on any statement made by either of the defendants, does not appear, nor does he testify who told him so, if anybody, and this answer is in direct contradiction to the one given by him a few lines earlier upon the very same page of the record, where he said it was given to him as evidence of good faith.

It will thus be seen that the representations claimed to have been made to the complaining witness were within a very narrow compass. Specifically they were: That the company was the owner of a secret formula for the production of varnishes, polishes, and stains discovered by Uebelmesser, and which had stood practical tests; that orders had been given for their goods by some of the largest firms in New York; that the company was in a good financial condition; that Wenderhold and Uebelmesser had put from $19,000 to $20,000 into the company; that the secret formulas were safely deposited; that they had made enough profit in a year to pay a dividend of 10 per cent. on the stock, and which had been paid back into the treasury; that one Walter Thompson connected with the company was a man of standing, through whom they could get money as they needed it; and that as the company had been making money for the past year, there was no danger that Woffinden would not be paid the $25 a week which the company had agreed to pay him for his services as salesman and ultimately as manager of the sales department. The truth or falsity of these representations could easily have been demonstrated. As a matter of fact, the record amply discloses their falsity. Woffinden's connection with the company was not of long duration. After he had put his $500 into the company he received stock, not in the American Transporal Company, but in another concern, the Transporal Products Company, although he did not notice the fact until a few months before the trial. He did not look at the stock when he received it. His money was paid to Wenderhold. His activities consisted in trying to sell some empty casks for the corporation, in which he was successful, in getting prices on cans for metal polish, and in endeavoring to collect accounts from persons who had purchased Transporal products. He succeeded in making some collections, from about 20 or 25 persons, of small amounts, out of a total of 150, many of whom repudiated their purchases, and said the goods had been left on trial and were not to be paid for unless they were satisfied. Woffinden remained with the company about five weeks, during which time, instead of $25 a week, he succeeded in getting $10 a week on account of his salary, being told it was the summer season, cash was rather low, and they could not pay him the full salary. At the end of this term he departed from the service of the company and never received back any part of his investment.

The prosecution called John P. Vandermyn, William Bloodgood, William J. Young, John G. Hultin, Walter Anderson, Edwin A. Oden, John J. Menges, Harry J. Zeachder, Charles N. Dusenbury, and George F. Proudfoot, who testified to similar transactions with the defendants. There is no doubt that there was some point of similarity

between each one of these transactions and that had with the complaining witness herein, and the general scheme of conduct of the defendants was the same in each case.  Their advertisements in the newspapers produced replies, and the writers calling in response to the invitation of the defendants were induced to invest from $300 to $600 in the Transporal business, $600 apparently being the maximum amount which the defendants hoped to obtain from each victim, although in one case they succeeded in borrowing $300 from Young, besides his original investment of $600.  In return for this investment, which was to evidence their good faith and interest in the enterprise, the investor was to be employed at $25 a week as sales manager, or in charge of the salesmen in the office, or in some way connected with the sales department.  None of these investors succeeded in getting back even the salary which was promised him, and the most successful of the witnesses got back only $30 out of his investment on account of his salary, while one of the least successful was the treasurer of the company, who got back nothing at all.  The witness Vandermyn testified that one of the representations made to him by Uebelmesser, when he wanted security for six months for his money so as to satisfy him that the whole thing was all right, was that Uebelmesser's wife owned property in New Jersey and he (Uebelmesser) was willing to have her give the witness six lots worth $150 apiece, and let him hold them as security for the money for six months; that thereafter the deed was turned over by Uebelmesser.  Some time later, Uebelmesser had asked the witness if he had recorded the deed, and when witness answered in the negative, Uebelmesser said, "Well, if I were you, I wouldn't do it, because it isn't worth the recording fee."  The testimony as to the lack of value of the lots was received after a colloquy with the court, in which the assistant district attorney said that the complaining witness had testified that the property in New Jersey was represented to him as amply sufficient to secure him the repayment of his money.  In this he was plainly in error.  The testimony does not support this contention.  The court received the testimony, not on the theory of a similar transaction, but on that of knowledge of the value of the lots, and limited it to the defendant, Uebelmesser.  He then said to the jury:

"Gentlemen of the jury, this evidence that is to be admitted as to statements of Uebelmesser about the lots sold or conveyed to this witness, I instruct you that that evidence can be considered by you only as binding on Uebelmesser, and not as binding on the other defendant, Wenderhold, unless there should be subsequent evidence conveying that knowledge or information to Wenderhold."

To the receipt of this evidence defendant's counsel duly objected.  While the testimony of this witness as to the representations made to him to induce him to part with his money was admissible, as is testimony of similar transactions in all cases of larceny by false pretense for the purpose of showing the criminal intent (People v. Katz, 209 N. Y. 311, 103 N. E. 305, Ann. Cas. 1915A, 501), I am of the opinion that the testimony should have been limited to proof of the representations made to him and the other witnesses for the purpose of

inducing them to part with their money, and that this testimony of Vandermyn as to Uebelmesser's confession of the lack of value of the lots was inadmissible, in view of the fact that concededly no representation had been made by Woffinden as to their value; that it was explicitly stated to him that the lots were worth less than the amount of money he was advancing, and that he does not testify to any statement made by either of the defendants justifying his conclusion that the deed was given him as security for his investment. The importance of this error is emphasized by the court's charge to the jury, just quoted, which made this knowledge of the lack of value of the lots evidence against Uebelmesser. While similar transactions are admissible in evidence upon the question of intent, it seems to me that it is stretching the doctrine too far, after having received such evidence, to take details of such representations not made to the complaining witness, and by proving their falsity (thus showing that other witnesses had an equally good grievance against the defendants and could perhaps have established an even stronger case of larceny against them), to supply an element entirely lacking in the complainant's case, and to amplify and pad out the lesser representations made to him. That this was not merely an accidental offer of improper proof is accentuated by the prosecution's calling Walter J. Lowenhaupt as their last witness in chief. Lowenhaupt was a convict who had been an associate of the defendant, Uebelmesser, and at the time of the trial was still an inmate of the New Jersey State Reformatory. He was called to testify to an admission made by the defendant, Uebelmesser, that he had bought 100 lots, or thereabouts, of the Davenport Company, that he had not paid for them because he gave notes maturing every three months, which could be renewed, and no cash was necessary, and that Uebelmesser had said it was a good thing to offer as security to investors investing money in his company, namely, the American Transporal Company. This testimony was received as an admission by Uebelmesser, made after the time of the occurrence for which he was indicted. It was received solely against him. Exception was promptly taken to the receipt of this evidence. Furthermore, the prosecution called as a witness, Isidore J. Auerbach, a real estate dealer, to testify to the value of the property of this Davenport Realty Company, as all of the property for which deeds were given to the investors seems to have constituted a part of this tract. Questioned as to the value of the Davenport tract, Auerbach was allowed to testify, over objection and exception, that the property was of so little value that it could not be determined by lots, but by acreage, and he swore that the value of the land was from $5 to $10 an acre; there being 16 lots to the acre, the value of 10 lots would be from $3.13 to $6.25.

The record satisfactorily discloses that there was no secret formula of any kind invented by Uebelmesser, or any one else associated with the company, and that all that it did was to buy regular trade varnishes, into the barrels containing which Uebelmesser poured through the bung hole a waste product of kerosene known as "Texico," about a pint to a barrel, stirring it up with a stirrer which he bought from

a peddling supply house, and then allowing it to stand for two days, when it became their mysterious product. Their special metal polish was bought from the manufacturers in bulk, and, being white in color, a certain amount of cochineal was mixed with it, whereupon that also became a special product of the company. It did appear that orders for the goods had been given by some of the parties enumerated by the defendants in their talks with investors, but it also sufficiently appears that whatever value the product had was due to its original qualities, and not to the defendants meddling with it. The company never paid any dividend, never earned any net profit, and its general activities seem to have been the procuring of money from dupes.

It also was disclosed by the examination of the defendant, Uebelmesser, that he had been connected with a variety of ventures in which he had been the active promoter, such as the American Moving Picture Company; the Charles R. Uebelmesser Company, makers of "Bakerine," a flavoring compound prepared according to a secret formula; a stenciling machine company; C. R. U. Brazing Salts, used for soldering cast iron; the American Railway Street Car Indicator Company; the United Suspender Company; the Automatic Brush Company; and the Realty Harvest Company. In these companies stock was sold to the public, sometimes by means of advertisements in the newspapers, and the end of each company was speedy and disastrous. But the fact that defendant may have been engaged in many swindling operations did not justify his conviction of the crime with which he was charged, nor deprive him of his right to a fair trial, wherein the rules of law were observed. In my opinion, the admission of the testimony of Lowenhaupt as to Uebelmesser's acquisition of the New Jersey property and his failure to pay therefor, and the fact that it was a good thing to offer as security to investors investing money in the company, of the testimony of Vandermyn as to Uebelmesser's admissions to him, after his transactions with the complaining witness, that the New Jersey property was practically valueless, of the testimony of Auerbach as to the value of the New Jersey property, and of the testimony of Zeachder and Proudfoot as to representations as to the value of the New Jersey lots made to them by Uebelmesser, not at the time that they were being induced to invest their money in the Transporal Company, but subsequent thereto (in the case of the first mentioned 60 days after his money had been invested, in the second, more than 30 days afterwards), all constituted reversible error. Some of this testimony would have been material upon the trial of an indictment for larceny of the money invested by Vandermyn, for in that case there had been a positive representation made to him by Uebelmesser that the lots were worth $150 apiece. But in the case at bar, as has been shown, there was no representation as to the value of this property for which the complaining witness was given the deed, and there is no testimony of any statement by Uebelmesser that a deed was given to Woffinden as security for his investment. Whatever may be said, therefore, as to the probative force of the evidence properly received upon the trial, it is plain that this improper testimony received under objection and exception must have and did prejudice the defendant, and requires the

reversal of the judgment of conviction and the granting of a new trial.

The judgment appealed from should therefore be reversed, and a new trial directed.